IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

LARRY JAY,

              Petitioner,                No. CIV-S- 07-2492 MCE CMK (TEMP) P

    vs.

MATTHEW C. KRAMER, Warden,

              Respondent.          FINDINGS AND RECOMMENDATIONS

_____/

Petitioner is a state prison inmate proceeding with counsel with a petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging a 2006 denial of parole.   He alleges that his parole suitability should be determined using ISL rather than DSL standards; that the presence of information about uncharged crimes in his central file has caused the parole board to be biased against him; and his rights to confrontation and cross-examination were violated when the Board refused to exclude letters from the Ventura County District Attorney's Office and other entities concerning the uncharged offenses; the Board's continued reliance on his commitment offense violates his right to due process; the denial violated his right to due process because it was not based on some evidence of dangerousness.

/////

/////

I. Background

On October 15, 1976, petitioner was convicted of first degree murder and robbery. Petition, Ex. 3 at 44. [1]   On November 24, 1976, he was sentenced to the term provided by law, which at that time was seven years to life.  Petn., Ex. 4 at 46.

On April 21, 2006, petitioner appeared before the Board of Parole Hearings for his sixteenth parole hearing.   His lawyer objected to the Board's consideration of letters from the Ventura County District Attorney's Office which posited the prosecutor's belief that petitioner had committed another murder and had conspired to commit a third murder.   Petn., Ex. 22 at 291, 294.   When the Board members overruled the objection to their consideration of the letter, counsel objected to the objectivity of the panel.  Petn., Ex. 22 at 292.   After a short recess, the panel reiterated its intention to consider the letters as relevant evidence while recognizing that the claims had not resulted in criminal charges and agreeing to give them only the "appropriate weight."  Petn., Ex. 22 at 293.   Petitioner thereafter refused to participate in the hearing and left the room; his lawyer remained in the room he no longer took part in the hearing.   Petn., Ex. 22 at 294-295.  The panel did not find petitioner suitable for parole.  Petn., Ex. 22 at 312-317.

Petitioner unsuccessfully pursued habeas relief in Ventura County Superior Court and then in the California Supreme Court.  Petn., Exs. 25 & 26.   He filed the instant petition on November 19, 2007 and on May 30, 2008, this court stayed the proceedings pending the en banc decision in Hayward v. Marshall, 603 F.3d 546 (9th Cir. 2010) (en banc).    The court lifted the stay after the Ninth Circuit issued its decision.  Respondent has now filed an answer and petitioner has filed a traverse.

/////

/////

////

_____

[1]  The exhibits attached to the petition are identified by Bates-stamped numbers and the court relies on these.

II.   Standard For Review Under The AEDPA

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  Also, federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (referenced herein in as "§ 2254(d)" or "AEDPA").[2]  It is the habeas petitioner's burden to show he is not precluded from obtaining relief by § 2254(d).  See Woodford v. Visciotti, 537 U.S. 19, 25 (2002).

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are different.  As the Supreme Court has explained:

> A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts.  The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case.  The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams [v. Taylor, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685, 694 (2002).  A state court does not apply a rule different from the law set forth in Supreme Court cases, or unreasonably apply such law, if the state court simply

---

[2]  Title 28 U.S.C. § 2254(d) establishes a precondition to federal habeas relief, not grounds for entitlement to habeas relief.  Fry v. Pliler, 127 S. Ct. 2321, 2326-27 (2007).

3

1  fails to cite or fails to indicate an awareness of federal law.  Early v. Packer, 537 U.S. 3, 8

2  (2002).

3          The court will look to the last reasoned state court decision in determining

4  whether the law applied to a particular claim by the state courts was contrary to the law set forth

5  in the cases of the United States Supreme Court or whether an unreasonable application of such

6  law has occurred.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002), cert. dismissed, 538 U.S.

7  919 (2003).  Where the state court fails to give any reasoning whatsoever in support of the denial

8  of a claim arising under Constitutional or federal law, the Ninth Circuit has held that this court

9  must perform an independent review of the record to ascertain whether the state court decision

10  was objectively unreasonable.  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  In other

11  words, the court assumes the state court applied the correct law, and analyzes whether the

12  decision of the state court was based on an objectively unreasonable application of that law.

13          It is appropriate to look to lower federal court decisions to determine what law has

14  been "clearly established" by the Supreme Court and the reasonableness of a particular

15  application of that law.  "Clearly established" federal law is that determined by the Supreme

16  Court.  Arredondo v. Ortiz, 365 F.3d 778, 782-83 (9th Cir. 2004).  At the same time, it is

17  appropriate to look to lower federal court decisions as persuasive authority in determining what

18  law has been "clearly established" and the reasonableness of a particular application of that law.

19  Duhaime v. Ducharme, 200 F.3d 597, 598 (9th Cir. 1999); Clark v. Murphy, 331 F.3d 1062 (9th

20  Cir. 2003), overruled on other grounds, Lockyer v. Andrade, 538 U.S. 63 (2003); cf. Arredondo,

21  365 F.3d at 782-83 (noting that reliance on Ninth Circuit or other authority outside bounds of

22  Supreme Court precedent is misplaced).

23  IV.  The Application Of DSL Parole Guidelines To An ISL Prisoner

24          Petitioner argues that because his crime occurred before California's adoption of

25  the Determinate Sentencing Law (DSL), he is entitled to have his suitability for parole considered

26  under the social rehabilitation standards in place under the Indeterminate Sentence Law (ISL).

He also argues that because the base terms for first degree murder under the ISL were from eight

to thirteen years, the thirty years he has served is a grossly disproportionate sentence.  Petition,

Points and Authorities (Ps & As) at 1-2

It is not clear whether petitioner is raising an ex post facto claim in addition to his

Eighth Amendment attack on the sentence.   Although the superior court noted that under both

ISL and DSL, a life prisoner must be found suitable for parole before a date is set, it did not

otherwise address any ex post facto claim.   Pet'n., Ex. 25 at 372.  It did explicitly reject

petitioner's disproportionality claim:

> "Of course, even if sentenced to a life-maximum, no prisoner can
> be held for a period grossly disproportionate to his or her
> individual culpability for the commitment offense."  (*Dannenberg*
> at 1096).

> "As we indicated in *Wingo*, *supra*, 14 Cal. 3d 169, 'traditionally,
> one who is legally convicted has no vested right to the
> determination of his sentence at less than the maximum [citation].
> Moreover, a defendant under an indeterminate term has no 'vested
> right' to have his sentence fixed at the term prescribed by the
> [parole authority] or any other period less than the maximum
> sentence provided by statute [Citation.] It has uniformly been held
> that the indeterminate sentence is in legal effect a sentence for the
> maximum term [citation], subject only to the ameliorative power of
> the [parole authority] to set a lesser term [Citation.] . . . Indeed it is
> fundamental to [an] indeterminate sentence that every such
> sentence is for the [statutory] maximum unless . . .  the [parole]
> authority acts to fix a shorter term.   The authority may act just a
> [sic] validly by considering the case and then declining to reduce
> the term as by entering an order reducing it. . . ." *Dannenberg* at
> 1097-1098.

> "Constitutional rights are thus adequately protected by holding that
> those indeterminate life prisoners who have been denied parole
> dates, and who believe, because of the particular circumstances of
> their crimes, that their confinements have been constitutionally
> excessive as a result, may bring their claims directly to court by
> petitions for habeas corpus . . . . We therefore hold that the Board
> proceeded lawfully when, without comparing [defendant's] crime
> to other second degree murders, to its base term matrices, or to the
> minimum statutory prison term for that offense, the Board found
> him unsuitable to receive a fixed and 'uniform' release date by
> pointing to some evidence beyond the minimum elements of his
> conviction–indicated exceptional callousness and cruelty with
> trivial provocation, and thus suggested he remains a danger to

1

public safety." (*Dannenberg* at 1098.) (Emphasis added.)

2

In petitioner's case the BPH did consider the particular circumstances of the crime, as indicated hereinabove, and by adhering to state law in doing so the BPH disposed of any argument by petitioner than he was denied constitutional and federal due process rights. (*Dannenberg* at p. 1098, fn. 18.)

3

4

5

Petn., Ex. 25 at 376.

6

With the exception of capital cases, successful Eighth Amendment challenges to

7

the proportionality of a sentence have been "exceedingly rare." Rummel v. Estelle, 445 U.S.

8

263, 272 (1980).  The Eighth Amendment forbids only extreme sentences that are grossly

9

disproportionate to the crime.  Solem v. Helm, 463 U.S. 277, 288, 303 (1983).  A life sentence

10

for murder, even without the possibility of parole, is not constitutionally disproportionate.

11

Harris v. Wright, 93 F.3d 581, 583-85 (9th Cir. 1996); see also Government of the Virgin Island

12

v. Gereau, 592 F.2d 192, 195 (3d Cir. 1979) (not constitutionally impermissble for the legislature

13

to authorize and court to impose a sentence that precludes the possibility that the defendant will

14

be paroled).   The state court did not apply federal law unreasonably in rejecting the claim.

15

Even if petitioner's argument could be read as raising an ex post facto claim, he is

16

not entitled to relief.   The Ex Post Facto Clause of the United States Constitution " is aimed at

17

laws that "retroactively alter the definition of crimes or increase the punishment for criminal

18

acts."  California Department of Corrections v. Morales, 514 U.S. 499, 504 (1995) (internal

19

quotations omitted).   The clause does not forbid "any legislative change that has any conceivable

20

risk of affecting a prisoner's punishment."  Id. at 507.  Any changes between ISL and DSL

21

standards of parole do not change the definition of the crime nor increase the punishment for

22

murder: "the DSL guidelines require consideration of the same criteria as did the ISL."  Connor

23

v. Estelle, 981 F. 2d 1032, 1033-34 (9th Cir. 1992) quoting In re Duarte, 143 Cal.App.3d 943,

24

951 (1983).   Here the Board's application of the DSL guidelines did not increase petitioner's

25

sentence: his sentence of seven years to life carries no guaranteed parole date but rather carries

26

with it the potential that petitioner could serve the entire term.  There was no violation.

1    V. The Parole's Board Bias/The Consideration Of Uncharged Conduct[3]

2            At the hearing held on April 21, 2006, petitioner's lawyer objected to letters from

3    the Ventura County District Attorney's Office and the San Buenaventura Police Department,

4    which suggested that petitioner had been involved in the murder of Lynn Mueller, and to a

5    second letter and attachments from the Ventura County District Attorney's Office advancing the

6    theory that petitioner had conspired to murder another woman.   Petn., Ex. 22 at 291, 292, 294;

7    Ex. 8 at 86-106.[4]

8            Commissioner Bryson said:

9            We're aware of that letter.  We're also aware of the letter March 8,
             2005, which is included in the board report.  And at the previous
10           hearing, this matter was discussed.  I don't know if you're aware–I
             don't know if you read the hearing transcript, but this matter was
11           explored thoroughly, and the information contained in the 2005
             letter, which appears to be the same as that contained in the 2006
12           letter, was permitted to be entered into the record, and so it's
             basically old news.  So we're going to overrule any objections to
13           the material in this letter.

14   Petn., Ex. 22 at 291-292.   Counsel then said because of the panel's exposure to this material, he

15   did not believe it would be objective and so recommended that petitioner not participate in the

16   hearing.   Petn., Ex. 22 at 292.   The panel took a brief recess and when it returned,

17   Commissioner Bryson said:

18           . . . Title XV, CCR 22801B  and/or 2402B [sic] states that all
             relevant and reliable information shall be considered in
19           determining suitability for parole.  This is not new information
             that's involved here, and we note for you that 2326 actually does
20           not apply because no criminal charges have been filed regarding
             this information.  As to our ability to be impartial, we recognize
21           that, in fact, this information has not resulted in criminal charges,

22   _____

23           [3]  Petitioner contends that the improper evidence includes crime scene photographs
     relating to the uncharged allegations, but it appears from the record that the crime scene
24   photograph presented to the board was from his commitment offense.  Compare Petn., Ps & A at
     12 with Ex. 8 at 88.

25           [4]  At the hearing, counsel identified a letter dated April 4, 2006.  Petn., Ex. 22 at 291.
     The only letters in the record before this court are dated July 1, 2003, March 1, 2002, and May
26   25, 1990.  Petn., Ex. 8.

1      and this Panel will therefore give that the appropriate – that
       information the appropriate weight, and I feel that I can be
2      impartial in this matter and do that.

3   Petn. Ex. 22 at 292.    Thereafter, petitioner left the hearing, though counsel stayed as an

4   observer.   Petn., Ex. 22 at 294-295.   The representative of the Ventura County District

5   Attorney's Office present at the hearing did not mention these allegations during his remarks and

6   the panel noted only the District Attorney's opposition in the course of denying parole.   Petn.,

7   Ex. 22 at 307-311, 315.

8              As he has here, in the superior court petitioner argued that the presence of this

9   information in petitioner's file prevented the panel from considering his application for parole

10  impartially.   The superior court rejected petitioner's claim.  It first noted that the 2006 panel had

11  referred back to the reasoning of the 2004 panel and then observed that the 2004 panel had told

12  petitioner it would not hold the allegations against him.  Petn., Ex. 22 at 375 & Ex. 9 at 120.

13  The court continued:

14      As part of the April 21, 2006 decision, information from the
        Ventura District Attorney and the police department was limited to
15      the following:

16          "As to Penal Code 3042 responses, responses
            indicate opposition to a finding of parole suitability,
17          specifically by the District Attorney of Ventura
            County." . . ..
18
        In other words, as part of its decision the BPH gave no
19      consideration to the alleged crimes for which the district attorney
        and Ventura police allege Mr. Jay is responsible; instead, the BPH
20      simply noted the district attorney's objection to a grant of parole.

21      In the absence of the district attorney providing further information
        with regard to the alleged murders in which petitioner is
22      implicated, there may come a time when an order prohibiting the
        BPH from considering that information and/or purging that
23      information from the petitioner's C-file . . . may be appropriate.
        However, integral to the hearing and the ruling of the BPH
24      petitioner received "all constitution process due" . . . by reason of
        the BPH not including that information as part of its deliberation
25      and ruling.

26  Petn., Ex. 25 at 375.

                                          8

1      Petitioner is entitled to a hearing before an unbiased decision maker who

2  considers his case individually.  O'Bremski v. Maass, 915 F.2d 418, 422 (9th Cir. 1990) (an

3  inmate is "entitled to have his release date considered by a Board that [is] free from bias or

4  prejudice").   However, a habeas petitioner must "state facts that point to a 'real possibility of

5  constitutional error.'"  Id. at 420.   In this case, petitioner has pointed only to the existence of the

6  letters themselves as support for his claim of bias and suggests that their presence in his C-file

7  influences not only the commissioners but also the correctional counselors who prepare the board

8  reports.   Petn., Ps & As at 7.   Petitioner ignores the fact that the commissioners did not list these

9  uncharged crimes as part of the reason for the denial and has not directed the court's attention to

10  their mention in the board report prepared for this hearing.  See Petn., Ex. 16 at 234 (listed adult

11  convictions & arrests; does not list uncharged offenses).   He has not borne his burden of

12  showing that the presence of the letters had an adverse impact on the consideration of his

13  suitability for parole.   The state court's rejection of this claim of error was not unreasonable

14  factually or legally.

15      Petitioner also alleges that the panel's consideration of these letters violated his

16  Sixth and Fourteenth Amendment rights to confront and cross-examine adverse witnesses.  Petn.,

17  Ps & As at 16.  He relies on Morrissey v. Brewer, 408 U.S. 471, 487 (1972), a case which held

18  that an inmate has the right to confront witnesses during a parole revocation hearing.   He has not

19  cited any relevant Supreme Court authority which holds that such a right is available in a hearing

20  to establish parole suitability and in fact has ignored Greenholtz v. Inmates of Nebraska Penal

21  and Correctional Complex, 442 U.S. 1, 9, 15-15 (1979), which emphasized the difference

22  between revocation proceedings and suitability hearings, a difference which led the court to

23  conclude that the trial-like protections available at a revocation hearing were not appropriate for a

24  suitability hearing, which is not an adversary proceeding.    See also Sites v. McKenzie, 423

25  F.Supp. 1190 (N.D. W.Va. 1976) (no right to cross-examine those who have provided adverse

26  information to parole board).

1    Finally, in the traverse, petitioner argues for the first time that the panel's reliance

2  on these letters violated his right to trial by jury on those facts which increase the term beyond

3  the statutory maximum.   A traverse is not the proper place to raise a new argument.  Cacoperdo

4  v. Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994).   But even if the argument was properly

5  before this court, it is specious:   in California, when a prisoner receives a sentence of seven years

6  to life, "the indeterminate sentence is in legal effect a sentence for the maximum term, subject

7  only to the ameliorative power of the [parole authority] to set a lower term."  Hayward, 603 F.3d

8  at 561, quoting People v. Wingo, 14 Cal.4th 169 (1975).

9  VI.  Continued Reliance On The Commitment Offense

10    Relying on Biggs v. Terhune, 334 F.3d 910 (9th Cir. 2003), overruled in part on

11  other grounds Hayward, 603 F.3d 546, petitioner argues that the panel's reliance on his

12  commitment offense and his criminal history to deny parole for the sixteenth time violated his

13  right to due process.  Petn., Ps & As at 19-23.[5]

14    The Superior Court rejected petitioner's claim:

15    Regarding the crime, petitioner argues that reliance thereon "for
16    the 16th time to deny parole violated petitioner's due process
       rights."  The issue is not how many times petitioner may have been
       denied parole, it is whether or not the BPH has provided requisite
17    procedural rights, applied relevant standards, and rendered a
       decision supported by some evidence.  . . .
18
Petn., Ex. 25 at 373-74.
19
20    In Biggs, the Ninth Circuit mused:

21    The Parole Board's decision is one of "equity" and requires a
       careful balancing and assessment of the factors considered.  As in
22    the present instance, the parole board's sole supportable reliance on
       the gravity of the offense and conduct prior to imprisonment to
23    justify denial of parole can be initially justified as fulfilling the

24    [5] Counsel cites a number of cases from the California Courts of Appeal by their Court of
Appeal numbers rather than by their citation in the official reports, as required by this court's
25  rules.  Local Rule 133(i)(2).  He has not provided any guidance on how to translate the docket
numbers into published cases, even assuming they are published.  The court declines to do
26  counsel's research for him and so will not rely counsel's cases.

> requirements set forth by state law.  Over time, however, should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him parole date simply because of the nature of Biggs' offense and prior conduct would raise serious questions involving his liberty interest in parole.

Biggs, at 916.   Petitioner's reliance on this passage is misplaced for two reasons.  First, it is dicta and thus cannot be clearly established law under the AEDPA.  Atkins v. Davison, 687 F.Supp.2d 964, 986 (C.D. Cal. 2009).  Second, whatever precedential value it had has been undercut by Hayward, which adopted the California Supreme Court's formulation of the some evidence standard as set forth in In Re Lawrence. 44 Cal.4th 1181 (2008).   And in Lawrence, the California Supreme Court said that the board may rely on the nature of the commitment offense when other evidence in the record shows that the offense is still probative of the inmate's dangerousness.  Id at 1214, 1219.

Accordingly, this claim of error is subsumed into the examination of the evidence supporting the denial of parole.

V.  The Denial Of Parole

In Greenholtz, 442 U.S. at 7, 11, the United States Supreme Court found that an inmate has "no constitutional or inherent right" to parole, even when a state establishes a system of conditional release from confinement.  The Court recognized, however, that the structure of parole statutes might give rise to a liberty interest in parole that would, in turn, mean an inmate was entitled to certain procedural protections.  Id. at 14-15.  In Greenholtz, the Court found that the "mandatory language and the structure of the Nebraska statute at issue" created such a liberty interest.  Board of Pardons v. Allen, 482 U.S. 369, 371 (1987).

In Hayward, 603 F.3d 546, the Ninth Circuit sitting en banc used the Greenholtz-Allen framework as a starting place for its consideration of the "limits there are on the denial of parole" and "what if anything the federal Constitution requires as a condition of the denial of parole."  Hayward, 603 F.3d at 552.  The court concluded that "in the absence of state law establishing otherwise, there is no federal constitutional requirement that parole be granted in the

1  absence of 'some evidence' of future dangerousness or anything else." Id. at 561.  Again, relying

2  on the Greenholtz-Allen framework, the court turned to California statutory, regulatory and

3  decisional law and concluded that a California inmate has a state created liberty interest "to

4  parole in the absence of 'some evidence' of future dangerousness." Id. at 562.  It reiterated that

5  "the right in California to parole in the absence of some evidence of one's future dangerousness

6  arises from California law," and provide the following direction:

7           [C]ourts in this circuit facing the same issue in the future need only
            decide whether the California judicial decision approving the
8           governor's decision rejecting parole was an "unreasonable
            application" of the California "some evidence" requirement, or was
9           "based on an unreasonable determination of the facts in light of the
            evidence.
10

11  Id. at 562-63 (footnotes omitted).

12           In Pearson v. Muntz, 606 F.3d. 606,(9th Cir. 2010), respondent sought

13  reconsideration of an order dissolving a stay issued while the en banc court considered Hayward.

14  The panel noted:

15           [S]tate -created rights may give rise to liberty interests that may be
            enforced as a matter of federal law.  Such was the case in
16           *Hayward*.  By holding that a federal court may review the
            reasonableness of the state court's application of the California
17           "some evidence" rule, *Hayward* necessarily held that compliance
            with the state requirement is mandated by federal law, specifically
18           the Due Process Clause.

19  Id. at 609 (citations omitted).  It then described the analysis a district court must undertake:

20           *Hayward* specifically commands federal courts to examine the
            reasonableness of the state court's application of the California
21           "some evidence" requirement, as well as the reasonableness of the
            state court's determination of the facts in light of the evidence.
22           That command can only be read as requiring an examination of
            *how* the state court applied the requirement.
23

24  Id. at 609.  Finally, the court said:

25           Having guaranteed the prisoners of the state that they will not be
            denied a parole release date absent "some evidence" of current
26           dangerousness, California is not permitted under the federal
            Constitution arbitrarily to disregard the "some evidence" in any

particular case.  It is therefore our obligation . . . to review the merits of a federal habeas petition brought by a California prisoner who asserts that the decision to deny him parole was not supported by "some evidence" of his current dangerousness.

Id. at 611.

In Cooke v. Solis, 606 F.3d 1206 (9th Cir. 2010), the court stated that "[w]hen habeas courts review the 'some evidence' requirement in California parole cases, both the subsidiary findings and the ultimate finding of some evidence constitute factual findings."  Id. at 1216.  The Cooke court did acknowledge the Hayward commands that district courts examine state habeas decisions in parole cases both for their fidelity to the some evidence standard and for the reasonableness of the underlying factual findings.  Id. at 1208, n.2.  This court will not treat Cooke as holding that the "some evidence" inquiry is a finding of fact in all cases, but rather that when, as in Cooke, all of the factual findings that make up the "some evidence" finding are not supported, the ultimate inquiry is similarly an unsupported fact.

As the Hayward court recognized, the some evidence standard arises from the interplay between state statutes, regulations and decisions and so it is those sources that inform this court's decision.  Irons v. Carey, 505 F.3d 846, 851 (9th Cir. 2007), overruled on other grounds, Hayward, 603 F.3d at 555.

Under California Penal Code section 3041(b):

The panel or board shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting.

Accordingly, the paramount concern in determining parole suitability in California is public safety.  In re Dannenberg, 34 Cal.4th 1061, 1080, 1084-1086 (2005) ("the overriding statutory concern" is for public safety; purpose of the statutes is to "guarantee that the Board has fully addressed the public safety implications" of the release determination).  This in turn

requires an assessment of the inmate's current dangerousness.  <u>Lawrence</u>, 44 Cal.4th at 1205.

This, in turn, requires more than "rote recitation of the relevant factors with no reasoning

establishing a rational nexus between those factors and the necessary basis for the

ultimate decision – the determination of current dangerousness." <u>Id</u>. at 1210.  The California

Supreme Court explained:

> [E]vidence in the record corresponding to both suitability and
> unsuitability factors–including the facts of the commitment
> offense, the specific efforts of the inmate toward rehabilitation,
> and, importantly, the inmate's attitude concerning his or her
> commission of the crime, as well as the psychological assessments
> contained in the record–must, by statute, be considered and relied
> upon by both the Board and the Governor, whose decisions must
> be supported by *some evidence*, not merely a hunch or intuition.

<u>Id</u>. at 1213 (emphasis in original).  It continued:

> [A]lthough the Board and the Governor may rely upon the
> aggravated circumstances of the commitment offense as a basis for
> a decision denying parole, the aggravated nature of the crime does
> not in and of itself provide some evidence of *current*
> dangerousness to the public unless the record also establishes that
> something in the prisoner's pre- or post- incarceration history, or
> his or her current demeanor and mental state, indicates that the
> implications regarding the prisoner's dangerousness that derive
> from his or her commission of the commitment offense remain
> probative to the statutory determination of a continuing threat to
> public safety.

<u>Id</u>. at 1214.

The regulations governing parole dates are found in title 15 of the

California Code of Regulations.  Section 2401 of this title provides in relevant part:

> In setting the parole date the panel shall consider the Sentencing
> Rules for the Superior Courts. The panel shall also consider the
> criteria and guidelines set forth in this article for determining the
> suitability for parole and the setting of parole dates, considering the
> number of victims of the crime for which the prisoner was
> sentenced and any other circumstances in mitigation or
> aggravation.

/////

/////

1          The terms in this article are guidelines only. The suggested terms
           serve as the starting point for the board's consideration of each case
2          on an individual basis.

3    15 Cal. Code Regs. § 2401.

4          Section 2402 provides in part:

5          (a) General. The panel shall first determine whether the life
           prisoner is suitable for release on parole. Regardless of the length
6          of time served, a life prisoner shall be found unsuitable for and
           denied parole if in the judgment of the panel the prisoner will pose
7          an unreasonable risk of danger to society if released from prison.

8          (b) Information Considered. All relevant, reliable information
           available to the panel shall be considered in determining suitability
9          for parole. Such information shall include the circumstances of the
           prisoner's social history; past and present mental state; past
10         criminal history, including involvement in other criminal
           misconduct which is reliably documented; the base and other
11         commitment offenses, including behavior before, during and after
           the crime; past and present attitude toward the crime; any
12         conditions of treatment or control, including the use of special
           conditions under which the prisoner may safely be released to the
13         community; and any other information which bears on the
           prisoner's suitability for release. Circumstances which taken alone
14         may not firmly establish unsuitability for parole may contribute to
           a pattern which results in a finding of unsuitability.

15

16         The regulations then address the circumstances that show suitability and

17   unsuitability for parole, noting that the "circumstances are . . . general guidelines; the importance

18   attached to any circumstance or combination of circumstances . . . is left to the judgment of the

19   panel."  15 Cal. Code Regs. § 2042(c).  Those things that suggest unsuitability include the

20   heinous, atrocious or cruel nature of the commitment offense, which may be shown by  the

21   number of victims injured, attacked or killed, the dispassionate or calculated manner of its

22   commission, abuse or mutilation inflicted on the victim, or indications that the crime was

23   committed with "an exceptionally callous regard for human suffering" or for a trivial motive.  15

24   Cal. Code Regs. § 2402(c)(1)(A)-(E).  Other factors include an inmate's previous record of

25   violence,  history of "unstable or tumultuous relationships," a record of sadistic sexual offenses,

26   /////

                                                  15

1  a lengthy history of "severe mental problems related to the offense," and serious misconduct in

2  prison.  15 Cal. Code Regs. § 2402(c)(2)-(6).

3              As with the unsuitability factors, those suggesting a prisoner's readiness for parole

4  are "general guidelines," with the weight to be given to any of them left to the discretion of the

5  panel.  They are the lack of a juvenile record; a history of "reasonably stable relationships;" acts

6  demonstrating remorse, which include an understanding of the magnitude of the offense,

7  attempting to repair the damage, seeking help for or relieving suffering of the victim; the crime

8  was the result of significant, long term stress; no significant history of violence; age which

9  reduces the likelihood of recidivism; realistic parole plans or the development of marketable

10  skills; and in-prison behavior suggesting an "enhanced ability to function within the law."  15

11  Cal. Code Regs. § 2402(d)(1)-(9).

12              The Superior Court denied petitioner's challenge to the denial of parole:

13          [T]he BPH made a finding that supports that the offense was
           especially heinous, atrocious or cruel.  Jay had the opportunity to
14          take his money and run, the crime scene indicated that [the victim]
           was voluntarily complying with Jay's directives by crossing her
15          hand[s] under her face as she lay down on the floor, but Jay went
           ahead with the murder.
16
           . . . .The nature of the prisoner's offense alone, as appropriately
17          found by the BPH, constitutes sufficient basis for denying parole.

18          . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

19          . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

20          Contrary to petitioner's assertion, the record does not indicate that
           the BPH "punished" the petitioner "for not confessing the facts as
21          presented in the probation officer's report." . . . . First, petitioner
           voluntarily absented himself from the hearing and therefore was
22          not present to address the issue of guilt. . . .  Second, while the
           Board shall not required an admission of guilt to any crime for
23          which the prisoner was committed, "the facts of the crime shall be
           discussed with the prisoner to assist in determining the extent of
24          personal culpability."  (Title 15, California Code of Regulations §
           2236, in part.)  A specific finding by the BPH with regard to this
25          issue was as follows:

26  /////

"The fact that the inmate's version of his life crime
remains significantly different from the evidence
calls into question his insight into his criminality;
therefore, he remains unpredictable and a threat to
public safety. .. . ."

The BPH also appropriately considered the suitability factors . . . .
Ex. 25 at 376-377.

Petitioner does not deny that his life  crime was "brutal, shocking and abhorrent."
Traverse at 9.   He argues that the Superior Court did not engage in any factual analysis
suggesting how the facts of the crime remained probative of current dangerousness.   Traverse at
10.   However, petitioner overlooks the state court's discussion of petitioner's minimization of
his actions during the offense.

In re Shaputis, 44 Cal.4th 1241 (2008) the California Supreme Court considered
what bearing an inmate's insight had on the evaluation of his current dangerousness.   Shaputis
had a history of domestic violence against his first wife and their children, a pattern which
continued throughout his twenty-three year marriage to the victim.   Shaputis had fired a weapon
at the victim on a prior occasion and told her family he would send her "home in a box."    On
the night of the murder, Shaputis called 911 to report the killing, which he characterized as an
accident.   Id. at 1246-1247.   Investigation showed that the gun could not have been fired
accidentally and that the shot had been fired from close range.   Id. at 1248.

Shaputis remained discipline free in prison, had a positive work record,
participated in all available AA and NA programs and additional therapy, including those
focusing on domestic violence.   He maintained that the shooting was accidental: he claimed the
victim gave him the gun, that he did not know it was loaded, and that he did not aim at the
victim.   Id. at 1249.   Psychological reports indicated that petitioner had a reduced ability to
achieve self-awareness and to develop relationships with others.   Id, at 1250.

/////

/////

The court upheld the Governor's reversal of the grant of parole:

> [A]lthough petitioner has stated that his conduct was "wrong" and feels some remorse for the crime, he has failed to gain insight or understanding into either his violent conduct or his commission of the commitment offense.  Evidence concerning the nature of the weapon, the location of the ammunition found at the crime scene, and petitioner's statement that he had a "little fight" with his wife support the view that he killed his wife intentionally, but as the record also demonstrates, petitioner *still* claims the shooting was an *accident*.  This claim, considered with the evidence of petitioner's history of domestic abuse and recent psychological reports reflecting that his character remains unchanged and that he is unable to gain insight into his antisocial behavior despite years of therapy and rehabilitative "programming" [fn 18] provide some evidence in support of the Governor's conclusion that petitioner remains dangerous and is unsuitable for parole.
>
> FN. 18 We note that expressions of insight and remorse will vary from prisoner to prisoner and that there is no special formula for a prisoner to articulate in order to communicate that he or she has gained insight into, and formed a commitment to ending, a previous pattern of violent behavior.

Id at 1260 (other footnote omitted).   As one California Court of Appeal explained, "an inmate's lack of insight into, or minimizing of responsibility for previous criminality, despite professing some responsibility, is a relevant consideration."  In re Lazor, 172 Cal.App.4th 1185, 1202 (2010).  See also 15 Cal. Code Regs. § 2402 (d)(3) (remorse is one suitability factor).

Even in the wake of Shaputis, at least one Court of Appeal has recognized that an inmate's continued reliance on his own version of events does not necessarily translate into a finding that he remains a danger years after the event.  In In re Palermo, 171 Cal.App.4th 1096 (2009), the inmate was convicted of second degree murder for killing his girlfriend.  At trial and at his parole hearings, Palermo insisted that the shooting was accidental.  Nevertheless, he expressed remorse for the killing, agreed that he deserved to be incarcerated, and accepted full responsibility for the killing.  Id. at 1110.   The Court of Appeal said:

> [I]n contrast to *Shaputis* . . ., defendant's version of the shooting . . . was not physically impossible and did not strain credulity such that his denial of an intentional killing was delusional, dishonest, or irrational.  And, unlike the defendants in *Van Houten, Shaputis*, . . ., defendant accepted "full responsibility" for his crime and

18

expressed complete remorse; he participated effectively in
rehabilitative programs while in prison; and the psychologists who
evaluated him opined that he did not represent a risk of danger to
the public if released on parole.  Under these circumstances, his
continuing insistence that the killing was the unintentional result of
his foolish conduct (a claim which is not necessarily inconsistent
with the evidence) does *not* support the Board's finding that he
remains a danger to the public.

Id. at 1112;  see also Rounds v. Sisto, 2010 WL 2605344 at 5 (E.D. Cal. 2010) (slight

minimization of role in the offense is not enough to show a failure of insight).

Petitioner suggests that the Board's conclusion that he lacks insight into his

criminality "implicitly violates of [sic] petitioner's right not to discuss the crime under *Penal*

*Code* section 5011 (b), nor admit guilt under *California Code of Regulations*, Title 15 Division

Two, Section 2236 and is contradicted by the medical experts, whose reports the panel arbitrarily

disregarded.  Petn., Ps & As at 11 ¶ 34.

This court acknowledges the many positive aspects of petitioner's institutional

record: his last disciplinary and counseling chrono were in 1998 and both were for smoking on

the job.  Petn., Ex. 22 at 296-97.  He has been the vice chairman of the Men's Advisory

Committee (MAC) since 2001 and had been lauded for his "dedication, professionalism,

leadership and organizational skills. . ." which were described as "far beyond the basic inmate

capabilities."  Petn., Ex. 22 at 298.  The 2005 psychological assessment, as well as many earlier

psychological assessments, placed petitioner in the "low range on all factors in his propensity to

commit violence [in] the future when compared to similar violent inmates."   Petn. Ex. 22 at

302; & Ex. 11 at 180; see also Petn., Ex. 11 at 184 (2002 report concluded "there is no evidence

at this point in time to indicate that he poses a risk for reoffense if released to the community.

Violence potential, in comparison with other inmates, continues to be below average."); Ex. 11 at

193 (Category X report uncovered "no evidence in his psychological profile that would suggest a

potential for violence") at 194 ("his behavioral controls have . . . taken hold, and it appears clear

that his level of dangerousness has been greatly reduced" at 198 (1998 report said "violence

1  potential without alcohol use is judged as being below average").  He has received praise from

2  his work supervisor.  Petn., Ex. 22 at 298.   He has solid parole plans and the support of his wife

3  and his wife's family.  Petn., Ex. 303-306.   Nevertheless, the Superior Court and the Board

4  relied on the nature of the offense, petitioner's minimization of his role in the offense and the

5  inadequacy of his parole plans to deny parole.

6          As petitioner refused to participate in the parole hearing, neither the panel nor the

7  courts reviewing the panel's determination had petitioner's current description and understanding

8  of the crime, apart from the accounts in various psychological reports over the years.  He is right

9  that under California law, the Board cannot, require him to admit guilt as a prerequisite to parole.

10  Cal. Pen. Code § 5011(b) and cannot require him to discuss the facts of the offense.  15 Cal.

11  Code Regs. § 2236.  If the prisoner declines to discuss the facts, "a decision shall be made based

12  on the other information available and the refusal shall not be held against the petitioner."  Id.

13  As the regulation provides, petitioner's state law right not to discuss the crime does not insulate

14  his previous accounts from scrutiny and does not prevent the board from relying on those

15  versions in reaching its determination.

16          The Board relied on this account of the murder:

17          [L]ate at night Jay robbed a bar tended by a woman who was
           particularly vulnerable due to age, physical condition, and who was
18          unarmed.  Jay even played a game of pool with her at the bar prior
           to murdering her.  The offense was carried out in a dispassionate
19          and calculated manner, in that intending to rob the bar, Jay lay in
           wait until the last customers left and the victim was closing the
20          business, and Jay knew the area, knew the bar did not have much
           business.  Jay also knew Mr. Dickerson was in the back room
21          sleeping, and that he had a gun.  Moreover, the victim was abused
           during the offense.  The offense was carried out in a manner
22          demonstrating exceptionally callous disregard for human suffering,
           in that Jay grabbed a hammer and hit her on the back of the head so
23          hard that her skull collapsed.  In fact, the blows opened a three to
           four inch diameter hole in the back of the victim's head lacerating
24          Mrs. Harris's brain.  An elongated bruise on the left side of her
           neck indicated she was standing when initially attacked.  The crime
25          scene indicated she voluntarily laid down on the floor crossing her
           hands under her face before the inmate delivered the fatal hammer
26          blows.

Petn., Ex. 25 at 312-313.   The psychological reports give petitioner's version of the offense:

> Although the inmate initially denied any involvement in the crime, he subsequently admitted his guilt. "On that particular day, I had been bar-hopping and was looking for a place to rob when I came upon this bar. I knew the area. I knew this bar didn't have much business. I didn't go in to kill anyone, I only intended to rob it. After everyone left, I asked the bartender to give me the money out of the cash register. I took the money and started out the door when the victim started screaming. I panicked because I knew Mr. Dickerson was in the back room sleeping and that he had a gun. I figured if I could get her to stop screaming, then I could get away with no problems.

> I turned around towards her and she was going toward the storage room, screaming.  That's when I started towards her, saw a hammer in the cigarette machine, picked it up and hit her in the back of the head. I knew from the sound of the blow to the head that I had hit her too hard. I did not recall hitting her again, but apparently I did, according to the police report.

> Another thing is that I just don't understand how her body got into the position in which they found her. I just remember her standing when I hit her. Maybe Mr. Dickerson woke up, tried to move the body or something. I don't know. I can't explain that at all. Anyway, after I hit her, I got into the truck, got to the beach, threw the hammer away and went to Jack-in-the-Box to get something to eat and went home.

> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

> When asking the inmate why this crime occurred, he said when the victim screamed, it startled him and made him mad.  He lost it. He was trying to get money so his family could reunite. He says at the time, he was an angry and frustrated individual. He wanted things his own way. He was trying to embarrass his family. He was like a ticking time bomb waiting to explode.

> The inmate states he had no intention to harm the victim when he went into the bar. He had no weapon with him. He said she did nothing and did not deserve what happened. "I lost it and became a lunatic. I was devastated when I realized I had killed someone. It is something that I'm going to have life [sic] with for the rest of my life." He said he is trying to do right by her memory by making his life mean something.

> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

21

The inmate accepts responsibility for the crime.  He has insight into why the crime occurred and does express remorse.  In rating this individual in the clinical factor, he would rate in the low range for future violence.

Petn., Ex. 11 at 177-179.

Melvin Macomber, who evaluated petitioner in 2002, said:

Mr. Jay openly admits that his behavior and life were totally out of control 25 years ago.  In a period of 25 years a lot of things can happen to a person who is incarcerated.   Some people remain the same and continue to be a danger to society.   . . . In other cases, people change over the years.  I agree with previous psychological evaluators. . . who believe Mr. Jay has changed.

Petn., Ex. 11 at 184.

A 1998 report quoted earlier reports and offered its own observations:

On 4/8/94, he was evaluated at Folsom State Prison . . . .  He stated that about two years previously he had become aware of the implications of the crime to the victim's family, his family, and the community in general.  This realization deepened his sense of remorse for his actions.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Inmate Jay spoke at length about his feelings of remorse about the commitment offense.  It would appear that his feelings of remorse are genuine and are based upon a realistic appraisal of the losses that the victim and her family experienced as a result of his [sic] death at his hand.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . .. . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

When questioned about his offense in the . . . Category X-Diagnostic Evaluation completed in 1988 he stated that he had just had an argument with his wife and they were living apart . . . and he knew that he had to find work and begin to pay bills in order to regain her confidence in him. . . .He had no weapon on him, but the victim cooperated anyway and emptied the cash register.  He ordered her into the rear portion of the bar and was walking away when she began screaming.  He panicked, feeling that she was trying to wake up the janitor who lived in the next room or alert individuals outside the bar.  He returned spontaneously to quiet her and observed a hammer laying nearby.  He picked the hammer up

22

and struck her one time on the head.  When confronted about the evidence indicating numerous blows inflicted on the victim while she was laying helpless on the ground, he initially refused to admit more than one blow, but acknowledged this did not meet the evidence and conceded he must have struck her more than once and that the final blow must have been inflicted while she was lying prone on the ground.

He acknowledged that evidence showed that he may have intended to kill her, and may also have been in an enraged state to have inflicted such massive injuries to the helpless victim.  Efforts were made to explore this issue more deeply in terms of repressed hostility . . . however, he was not accepting of this theory.  He stated he simply panicked and struck the victim out of fear he would be discovered.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . .He blames himself for this offense and no one else.  He stated he accepts full responsibility for it and stated that no matter how many years he has to stay incarcerated for this offense, the number of years . . . cannot begin to match his feelings of remorse and sorrow at the victim's death, and the fact that he is the person responsible for her death.  His feelings of remorse and sorrow appear to be sincere and genuine.

Petn., Ex. 11 at 196-197.

Despite these favorable reports and despite petitioner's expressions of remorse, this court cannot find that the state court applied the "some evidence" test unreasonably. Petitioner's version of the offense places it squarely within his narrative of a life out of control. In that version, a cooperative victim gave him the money from the cash register, but then started screaming as petitioner left the bar, causing him to grab a hammer in his panic and hit the victim harder than he had meant to do.  In that version, he "lost it and became a lunatic," felling her with the one blow to her head that he remembered.  There is no explanation for the disconnect between his statement that he was devastated when he realized he had killed someone and the fact that he stopped for some fast food after the murder,

The evidence before the Board showed something quite different.  According to the probation report, the victim had a large bruise on her neck, which was inflicted when she was

23

1  standing.  Petn., Ex. 3 at 53  The arrangement of the victim's body showed that she lay down

2  voluntarily, hands under her head, rather than collapsing from the blow to the back of her head.

3  The position of her body on the floor also suggests that the victim was not screaming for help

4  when petitioner administered the blows and that the blows therefore had nothing to do with

5  quieting the victim so he could escape with the proceeds of the robbery.   This case is thus unlike

6  Palermo and Rounds, for petitioner's version does not square with the physical evidence and was

7  more than a slight minimization of his actions.   Instead, this case is like In re Taplett, ___

8  Cal.App.4th ___, 2010 WL 3230819 (2010), where the Court of Appeal upheld the Governor's

9  denial of parole, despite unanimous psychological opinion that the petitioner was unlikely to

10  become involved in violence if released, when the petitioner maintained that she believed her

11  companion was only planning to fight, not to kill, the victim, despite the contrary evidence.  As

12  the Court observed, this "failure to accept the full extent of her responsibility for the murder . . .

13  renders the circumstances of that offense relevant to her current level of dangerousness."  Id at 7.

14  The superior court's similar conclusion in this case is not an unreasonable application of law.

15          IT IS THEREFORE RECOMMENDED that the petition for a writ of habeas

16  corpus be denied.

17          These findings and recommendations are submitted to the United States District

18  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-

19  one days after being served with these findings and recommendations, any party may file written

20  objections with the court and serve a copy on all parties.  Such a document should be captioned

21  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

22  shall be served and filed within twenty-one days after service of the objections.  The parties are

23  ////

24  ////

25  ////

26  ////

1  advised that failure to file objections within the specified time may waive the right to appeal the

2  District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

3

4  DATED:  January 12, 2011

5

6  CRAIG M. KELLISON
   UNITED STATES MAGISTRATE JUDGE

7

8  sg/jay2492.submhc

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26